J-A13033-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KENNETH HAIRSTON | |
| Appellant | No. 1108 WDA 2013 |

Appeal from the Judgment of Sentence February 28, 2002
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0008984-2000
CP-02-CR-0009862-2000

BEFORE:  PANELLA, J., SHOGAN, J., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED SEPTEMBER 17, 2015**

Kenneth Hairston appeals *nunc pro tunc* from the judgment of sentence entered February 28, 2002, in the Allegheny County Court of Common Pleas.  The trial court imposed an aggregate sentence of 49 to 132 years' imprisonment after he was convicted by a jury of various charges, including carrying a firearm without a license, terroristic threats, rape, involuntary deviate sexual intercourse ("IDSI"), and corruption of minors.[1] At Docket No. 9862-2000, Hairston was convicted of numerous sexual offenses for the repeated sexual abuse of his stepdaughter, C.H., both when she was a minor and when she was an adult.  The charges at Docket No. 8984-2000, stemmed from an incident that occurred in May of 2000, when

_____

[1] 18 Pa.C.S. §§ 6106, 2706, 901, 3121, 3123, and 6301, respectively.

Hairston threatened C.H. and her boyfriend, and attempted to rape C.H.  On appeal, Hairston challenges several evidentiary rulings, the trial court's failure to give a requested jury instruction, and the legality of his sentence.  Because we conclude that Hairston's sentence is illegal pursuant to *Alleyne v. United States*, 133 S.Ct. 2151 (U.S. 2013) and its progeny, we are constrained to vacate the judgment of sentence and remand for re-sentencing.  In all other respects, however, we find Hairston is entitled to no relief.

The facts underlying Hairston's arrest and convictions are as follows.  C.H. was five years old when Hairston married her mother.  During the summer of 1993, when she was 14 years old, Hairston began to sexually abuse her.  The first incident occurred as she was preparing to take a trip by herself to North Carolina.  Hairston found a letter C.H. had written to a boy, and he gave her a condom to take with her on the trip.  C.H. testified she did not want the condom because she was not sexually active.  Hairston, instructed C.H. to show him her breasts so he would not tell her mother.  C.H. complied, and when she did so, Hairston fondled her breasts.  *See* N.T., 12/12/2001, at 73-76.

After that, Hairston continued to sexually abuse C.H..  The incidents, which escalated to oral sex, occurred in their house and in his car.  Although C.H. asked him to stop, Hairston told her to "stop fighting with him" or he would "take us all out," and if she told anyone, "it would all be over." *Id.* at 79.  C.H. believed Hairston meant he would harm her and her family.

- 2 -

When C.H. turned 18 years old, Hairston began to vaginally rape her. Although she cried and asked him to stop, Hairston continued to make threats to the family. C.H. testified she believed his threats because Hairston "usually [had] his gun on him." *Id.* at 81. In fact, she recounted that there were times when Hairston was sexually abusing her that he would take out the gun, lay it beside her head, and threaten to use it. *Id.* at 82. When she was 21 years old, C.H. moved into her own apartment. Hairston, however, continued to sexually abuse her when he visited a couple of times a month. *Id.* at 83-84. C.H. acknowledged that she never told anyone of the abuse until May of 2010. *Id.* at 82.

On the evening of May 20, 2010, C.H. went to the movies with her boyfriend, Jeffrey Johnson, and her best friend. At approximately 2:00 a.m., she and Johnson returned to her apartment. At that time, C.H. discovered numerous voicemail messages from Hairston asking where she was and demanding she call him. C.H. testified Hairston "was basically yelling at my voicemail." *Id.* at 86. About 15 minutes after she and Johnson returned, Hairston called again. C.H. recounted that Hairston was "yelling at me, asking me where I was, who was there, why hadn't I called, that kind of thing." *Id.* at 87. Although C.H. told him she was out with her best friend, Hairston persisted, calling three or four more times and telling her he was coming over the next day.

C.H. testified she was "very upset" and "crying" after speaking to Hairston. *Id.* at 88. Johnson asked her what was wrong, and she

eventually confided that Hairston had been sexually abusing her for years.[2] Johnson then offered to stay with her that night to make sure she was safe. *Id.* at 89. He testified C.H. told him, "You don't know my dad. I got a feeling he's going to come. He's going to do something." *Id.* at 49.

At approximately 7:00 a.m., on the morning of May 21st, C.H. heard her doorbell ring, followed by knocking. When she did not immediately respond, she heard knocking on the windows, and recognized Hairston's voice yelling for her. C.H. panicked and hid in her closet. *Id.* at 89-90. Johnson then went to the door and saw Hairston trying to lift the door latch. Johnson, who had met Hairston before, tried to calm him down, and opened the door. Johnson testified that when Hairston entered the apartment, he "looked crazy" like he was "possessed." *Id.* at 52. Hairston kept asking where C.H. was, and eventually found her, "hysterically crying," hiding in the closet. *Id.* Hairston then said, "I'm not going to hurt nobody" as he pulled out a gun. *Id.* at 53.

Hairston began waving the gun at both of them, and stated, "I'm not going to jail" and "Everybody is going to die." *Id.* at 53, 92. Although

_____

[2] Johnson testified that C.H. was reluctant to tell him why she was upset by Hairston's calls. She initially told Johnson that Hairston would not leave her alone. However, after Johnson continued to question her, C.H. admitted that she and Hairston had been having sex since she was young. *Id.* at 47-48. On cross-examination, Johnson clarified that C.H. told him "she was being raped." *Id.* at 63. He also stated that their conversation lasted "a couple hours." *Id.*

Johnson continued to try to placate Hairston, Hairston pointed the gun at him and told him he had better leave.  At that point, Johnson left the apartment to find help.

When C.H. and Hairston were alone in the apartment, Hairston asked if Johnson was her boyfriend.  When she replied yes, he stated "The only person that you will be fucking will be me." *Id.* at 93.  He then pushed her onto the couch, pointed the gun at her, and ordered her to go into her bedroom.  Hairston proceeded to undress himself and tried to undress C.H., but she resisted.  *Id.* at 94.

In the meantime, Johnson flagged down a passing police officer, Pittsburgh Police Sergeant William Gorman, and told him there was a guy with "a gun acting crazy" in the apartment upstairs.  *Id.* at 55.  Sergeant Gorman radioed for back-up and, when additional officers arrived, they pounded on the locked, outer security door.  C.H. testified that when she and Hairston heard the officers at the door, Hairston put his pants back on, removed the clip from the gun, and threw the gun under her bed.  Hairston then told C.H. to "go to the door and tell [the officers] everything was okay and that they could leave." *Id.* at 96.  However, when C.H. answered the door, she told the officers Hairston had a gun, and then she ran down the street toward Johnson.  *Id.* at 97.

Sergeant Gorman testified that C.H. "was ash in color, shaking, [and] crying" when she answered the door, and "just kept repeating under her breath, He's got a gun."  N.T., 12/13/2001, at 197.  After the officers

ensured C.H. was safely away from the premises, they entered the apartment and announced their presence. There, they encountered Hairston, wearing only slacks, walking from the bedroom. The officers placed him on the floor and handcuffed him. Sergeant Gorman explained to Hairston why the police were called, and Hairston claimed he lived in the apartment, and found a man there with his daughter. He also began saying "I can't go to jail. I've never been arrested." *Id.* at 199. Sergeant Gorman recovered a black semi-automatic pistol from the bedroom floor, and a live bullet lying approximately one foot from the gun. *Id.* at 200. As the officers were escorting Hairston out of the building, he broke free, yelled "I can't go to jail," and ran off the porch onto the canopy of the adjacent storefront. *Id.* at 202, 225. The awning then "smashed into the store front window and [Hairston] hit the sidewalk." *Id.* at 221. Although Hairston was injured in the fall, he continued to struggle with police, stating "I didn't do anything" and "I'm not going to jail," before they were finally able to subdue him. *Id.* at 222.

Hairston was subsequently charged with a multitude of crimes. For the repeated sexual abuse of his stepdaughter, Hairston was charged at Docket No. 9862-2000, with rape, involuntary deviate sexual intercourse ("IDSI") (two counts), sexual assault, aggravated indecent assault, indecent

assault, and corruption of minors.[3] With regard to the events that occurred on May 21, 2000, Hairston was charged at Docket No. 8984-2000, with burglary, attempted rape, carrying a firearm without a license, terroristic threats (two counts), simple assault (two counts), indecent assault, resisting arrest, attempted escape, possession of an instrument of crime, and harassment by communication.[4]

The cases were later consolidated for a jury trial scheduled to begin in December of 2001. However, while Hairston was free on bail prior to trial, he was arrested and charged with the murder of his wife and son.[5] Hairston

_____

[3] **See** 18 Pa.C.S. §§ 3121(a)(1) and (2), 3123(a)(1) and (2), 3124.1, 3125(a)(1), 3126(a)(1), and 6301, respectively. With regard to the two counts of IDSI, Count 2 was based on conduct that occurred from May 30, 1995, through May 21, 2000, and Count 5 was based on conduct that occurred from 1993 through May 29, 1995. **See** Criminal Information, Docket No. 9862-2000, 8/15/2000.

[4] **See** 18 Pa.C.S. §§ 3502, 901/3121, 6106, 2706, 2701(a)(3), 3126(a)(1), 5104, 901/5121, 907(b), and 5504(a)(1) or (2), respectively.

[5] On June 11, 2001, Hairston struck his wife and autistic son with a sledgehammer, stabbed himself twice in the chest, and ignited the house on fire, intending to kill himself, as well his family members. Hairston acknowledged he "intentionally piled debris around the house to fuel the fire and to 'make sure that we were gone.'" **Commonwealth v. Hairston**, 84 A.3d 657, 663 (Pa. 2014) (citation omitted), *cert. denied*, 135 S. Ct. 164 (U.S. 2014). Responding firefighters found Hairston's son alive, but the boy later died while being treated at the hospital. Hairston's wife was found dead at the scene. Hairston subsequently admitted to the police "that he had killed his wife and started the fire, and that his motivation for doing so was anxiety and outrage over the pending rape allegations and imminent trial on these charges." *Id.* at 662.

was subsequently convicted of two counts of first-degree murder and sentenced to death on July 11, 2002.[6] His conviction and death sentence have been upheld on appeal. *See Hairston*, *supra*.

With regard to the case *sub judice*, on December 14, 2001, following a three-day trial, a jury returned a verdict of guilty on all charges at Docket No. 9862-2000, and all charges except burglary, indecent assault, and harassment by communication at Docket No. 8984-2000.[7] Thereafter, on December 17, 2001, the Commonwealth notified Hairston of its intent to seek a mandatory minimum sentence for two of the convictions.[8] The cases proceeded to sentencing on February 28, 2002.

_____

[6] The murder charges were originally consolidated with the charges *sub judice* for trial. However, the Commonwealth later sought to sever the murder charges "for the express purpose of utilizing a conviction of the assault charges as an aggravating circumstance in the penalty phase of the murder trial." *Id.* at 677.

[7] Hairston did not testify at trial. However, counsel stated, during his opening and closing remarks, that Hairston admitted he and C.H. were involved in a consensual sexual relationship, which began after she turned 18 years old. *See* N.T., 12/12/2001 at 39-40; N.T., 12/13/2001, at 255. Counsel intimated that C.H. told Johnson she had been raped because "it was easier to say that someone was raping her over a period of time than trying to explain how she could have had a sexual relationship with the man who she called dad but was her stepfather." N.T., 12/12/2001, at 40.

[8] Specifically, the Commonwealth sought a mandatory minimum sentence pursuant to 42 Pa.C.S. § 9712 on the attempted rape conviction at Docket No. 8984-2000, because Hairston used a firearm, and pursuant to 42 Pa.C.S. § 9718 for the one IDSI conviction at Docket No. 9862-2000, due to the age of the victim at the time of the crime.

At Docket No. 9862-2000, the court imposed a sentence of 10 to 20 years' imprisonment for rape, a consecutive term of 10 to 20 years for one count of IDSI, a consecutive mandatory minimum sentence of 10 to 20 years for a second count of IDSI, and a consecutive term of two to five years for corruption of minors — an aggregate sentence of 32 to 65 years' imprisonment.[9]   At Docket No. 8984-2000, the trial court imposed a mandatory minimum sentence of 10 to 20 years' imprisonment for attempted rape, a consecutive term of three to seven years for carrying a firearm without a license, and two consecutive sentences of two to five years for each count of terroristic threats — an aggregate sentence of 17 to 37 years' imprisonment.[10] Additionally, the court directed the sentences at each docket number run consecutive to each other.   Therefore, the aggregate sentence imposed was 49 to 132 years' imprisonment.

Hairston did not file a timely direct appeal.   Rather, on May 8, 2006, he filed an untimely post-conviction collateral petition seeking, *inter alia*, reinstatement of his direct appeal rights.   By order entered May 30, 2006, the court granted Hairston's request and reinstated his direct appeal rights. Thereafter, on June 7, 2006, Hairston filed a motion for leave to file post-

_____

[9] The remaining convictions merged for sentencing purposes.

[10] No further penalty was imposed on the remaining convictions.

sentence motions *nunc pro tunc*.[11]  Hairston followed this motion with a preemptory notice of appeal, filed on June 20, 2006, in which he stated he "desires this notice to be inoperative if and when his right to file post-sentencing motions is reinstated on or before June 29, 2006." Notice of Appeal, 6/20/2006.  The court did not reinstate Hairston's right to file post-sentence motions within the relevant time period, and the case proceeded on appeal.

On July 3, 2008, a panel of this Court quashed the appeal, concluding the trial court erred in reinstating Hairston's direct appeal rights since his collateral petition was untimely filed.  Thereafter, on December 18, 2009, the Pennsylvania Supreme Court denied Hairston's petition for review.  **See** **Commonwealth v. Hairston**, 959 A.2d 964 (Pa. Super. 2008) (unpublished memorandum), *appeal denied*, 986 A.2d 149 (Pa. 2009).

Hairston then pursued *habeas corpus* review in federal court. Subsequently, on November 6, 2012, the United States District Court for the Western District of Pennsylvania reinstated Hairston's state appellate rights. **See** Order, 11/6/2012.  Thereafter, on January 7, 2013, the trial court entered an order reinstating Hairston's right to file post-sentence motions within 60 days of the entry of the order.  The court vacated its January 7th

_____

[11] Although Hairston requested leave to file post-sentence motions in his collateral petition, the trial court did not expressly grant him leave to do so in its May 30, 2006, order.

- 10 -

order, in part, on January 21, 2013, and directed Hairston to file post-sentence motions no later than January 31, 2013.  **See** Order, 6/21/2013 (noting post-sentence motions must be filed no later than 10 days after sentencing).

Hairston filed an initial post-sentence motion on January 30, 2013, followed by a supplemental motion on May 29, 2013.  On June 12, 2013, the trial court entered an order denying Hairston's post-sentence motions, and this timely appeal followed.[12]

Hairston raises the following six issues on appeal:[13]

(1)    Whether the trial court erred in limiting Hairston's cross-examination of C.H. regarding poems she wrote during the time of the alleged abuse?

(2)    Whether the trial court abused its discretion in permitting witness Jeffrey Johnson to testify to numerous hearsay statements made by the purported victim?

_____

[12] On July 23, 2013, the trial court ordered Hairston to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) no later than September 15, 2013.  Hairston complied with the court's directive, and filed a concise statement on September 13, 2013.  Thereafter, appellate counsel filed a petition to withdraw, which the trial court granted on November 6, 2013.  Newly appointed counsel, Bruce Antkowiak, Esq., petitioned for leave to file a supplementary concise statement, which was granted by the trial court on November 27, 2013.  Thereafter, Antkowiak filed a supplementary concise statement on December 26, 2013.  The trial court subsequently filed three opinions (8/26/2014, 9/18/2014, and 10/28/2014).  The first two opinions appear to be identical, and the third contains only stylistic changes.  Accordingly, we will refer only to the third opinion in our review.

[13] We have reorganized Hairston's claims as listed in his brief for purposes of disposition.

(3)     Whether the trial court abused its discretion in admitting testimony that C.H.'s mother and brother were deceased?

(4)     Whether the trial court erred in failing to provide the jury with a mistake of fact instruction?

(5)     Whether the accumulation of prejudice from each of the alleged trial court errors warrants relief?

(6)     Whether the trial court's imposition of a mandatory minimum sentence for several convictions was illegal?

*See* Hairston's Brief at i-ii.

Hairston first challenges the ruling of the trial court limiting his cross-examination of C.H. concerning "intimate" poems she wrote during the time she alleged she was being sexually abused by Hairston.  Preliminarily, we note both the scope of cross-examination and the admissibility of evidence are matters within the discretion of the trial court, which we will reverse on appeal only upon a showing of an abuse of discretion.  ***Commonwealth v. Ballard***, 80 A.3d 380, 394 (Pa. 2013), *cert. denied*, 134 S. Ct. 2842 (U.S. 2014); ***Commonwealth v. Stokes***, 78 A.3d 644, 654 (Pa. Super. 2013) *appeal denied*, 89 A.3d 661 (Pa. 2014).

Prior to the start of trial, the Commonwealth moved to restrict Hairston's cross-examination of C.H. regarding certain poems she wrote when she was 18 years old.  The prosecutor stated that during jury selection the previous day, defense counsel turned over a booklet of poems written by C.H. which counsel intended to cross-examine her about at trial.  N.T., 12/12/2001, at 5.  The prosecutor argued that the poems were irrelevant, as well as inadmissible under the Rape Shield Law.  ***Id.***  ***See*** 18 Pa.C.S. §

3104. Defense counsel disagreed, contending the poems were relevant because they were written during the time the rapes allegedly occurred. Further, because Hairston's defense was that C.H. consented to the sexual acts after she turned 18 years old, counsel argued the poems were relevant to attack her credibility and demonstrate her consent. N.T., 12/12/2001, at 6.

The trial court first ruled that if the poems related to anyone other than Hairston, they were inadmissiable under the Rape Shield Law as evidence of C.H.'s past sexual conduct. *Id.* at 6. However, the court further stated counsel could, preliminarily, establish if the poems were written about Hairston, in which case they would be relevant for cross-examination purposes. The court explained:

> THE COURT: You need simply only to ask [C.H.] when she's on the stand on cross-examination when you wrote this particular passage, were you referring to the defendant.
>
> If she says yes, then it may well be it's appropriate for you to cross-examine.
>
> If she says no, it won't go any further.
>
> [Defense Counsel]: I understand that.
>
> THE COURT: Unless you can establish through some other evidence that it is he to whom she's referring.
>
> [Defense Counsel]: I understand that.

*Id.* at 6-7.

Thereafter, during cross-examination of C.H., defense counsel first established that she did not have a boyfriend from the ages of 18 through

- 13 -

21. N.T., 12/13/2001, at 154. He then asked her about a number of poems she had written and compiled in a book. N.T., 12/13/2001, at 158. C.H. acknowledged that "[a] lot" of the poems were written when she was 18 years old and that "some of [the] poems are descriptive, in an intimate nature, as to male and female[.]" *Id.* Immediately thereafter, the Commonwealth objected on two bases: (1) Hairston failed to file written notice of this evidence under the Rape Shield Law, and (2) Hairston failed to establish the poems were written about him per the court's pretrial ruling. *Id.* at 158-159. In response, defense counsel argued (1) the Rape Shield Law was not applicable because his questions did not involve "actual sexual conduct," but rather focused on poetry, and (2) he had laid a foundation for the evidence by establishing C.H. did not have a boyfriend at the time the poems were written. *Id.* at 159. Defense counsel also argued the poems did not refer to **past** sexual conduct because they were written while the conduct was taking place. *Id.* at 160. The court overruled the objection. Thereafter, counsel showed C.H. certain poems and attempted to establish they were of an intimate nature. *Id.* at 162-163. Each time, however, the trial court sustained the Commonwealth's objection because counsel had not established the poems were relevant to the charges at issue. *Id.* Counsel then asked C.H. if each poem was written about Hairston, to which she responded, "No." *Id.* at 162-164. With this factual background, we will consider Hairston's claim on appeal.

Hairston argues the trial court erred in limiting his cross-examination of C.H. regarding the poems for several reasons. First, he contends the Rape Shield Law does not apply. He asserts "[t]he poems did not represent 'past sexual conduct'" of the victim because they were written at the time the conduct was ongoing. Hairston's Brief at 28. Second, Hairston argues that even if the law was applicable, the poems were admissible to demonstrate "that the relationship [Hairston] had with [C.H.] during these critical years was consensual." *Id.* at 29. Third, he contends the court improperly excluded the evidence based on its own credibility determination that C.H. was telling the truth when she testified that the poems were not written about Hairston. He further asserts "the jury should have been allowed to read the poems and assess whether they did refer to Hairston, the only individual [C.H.] said she was having intimate relations with at the time she wrote them." *Id.* at 28-29. Lastly, Hairston claims the trial court's error in limiting his use of this evidence was not harmless because the "probative value [of the poems] overwhelmed any suggestion of unfair prejudice and nothing else in this case was as potentially compelling on the issue of the consensual nature of the sexual relations all parties admitted were ongoing during the time these poems were written." *Id.* at 31-32.

The Rape Shield Law was enacted to "prevent a trial from shifting its focus from the culpability of the accused toward the virtue and chastity of the victim ... [and] to exclude irrelevant and abusive inquiries regarding prior sexual conduct of sexual assault complainants." *Commonwealth v.*

*K.S.F.*, 102 A.3d 480, 484 (P. Super. 2014) (citations omitted). The statute generally precludes evidence of the alleged victim's past sexual conduct, including specific instances, opinion evidence and reputation evidence. 18 Pa.C.S. § 3104(a). However, the statute permits "evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence."[14] *Id.* Further, Section 3104(b) mandates that a defendant who seeks to offer evidence of the victim's prior sexual conduct under subsection (a) "shall file a written motion and offer of proof at the time of trial." 18 Pa.C.S. § 3104(b).

Here, the trial court concluded that C.H.'s poems fell under the rubric of Rape Shield evidence and Hairston's failure to file the requisite written motion and offer of proof prior to trial "was sufficient to justify excluding this evidence." Trial Court Opinion, 10/23/2014, at 10. Nevertheless, despite

_____

[14] The courts of this Commonwealth have also found three other exceptions to the Rape Shield Law, namely:

> (1) evidence that negates directly the act of intercourse with which a defendant is charged; (2) evidence demonstrating a witness' bias or evidence that attacks credibility; and (3) evidence tending to directly exculpate the accused by showing that the alleged victim is biased and thus has motive to lie, fabricate, or seek retribution via prosecution.

*Commonwealth v. Burns*, 988 A.2d 684, 690 (Pa. Super. 2009) (citations omitted), *appeal denied*, 8 A.3d 341 (Pa. 2010). Hairston does not argue any of these other exceptions are applicable in the present case.

- 16 -

this omission, the court gave Hairston the opportunity to lay a foundation for the admissibility of the poems by establishing they were, in fact, written about Hairston. However, the trial court explained: "Once [C.H.] testified that the poems were not about the defendant, any further inquiry into the content of the poems, and the poems themselves, became inadmissible." *Id.* The court further opined that "[p]ermitting inquiry into poems [C.H.] wrote about intimate relations with persons other than the defendant would have constituted an irrelevant and abusive intrusion into the victim's sexual conduct." *Id.* at 10-11.

We find no abuse of discretion on the part of the trial court. First, we agree the poems at issue were subject to the Rape Shield Law. As noted *supra*, Hairston's defense to the rape charges was consent. Through counsel, he admitted he had sex with C.H. after she turned 18 years old, but claimed it was a consensual relationship. Accordingly, Hairston sought to introduce the poems at issue as evidence that C.H. wrote romantic and intimate poems about their relationship to discredit her testimony that she did not consent to their sexual relationship. **See** Hairston's Brief at 29 (stating his "entire purpose for wanting to admit these poems was … to argue that they demonstrated that the relationship he had with her during these critical years was consensual."). This is the essence of Rape Shield evidence.

Further, Hairston's contention that the poems did not relate to "past sexual conduct" because they were written during the time the offenses

were ongoing is specious.  *Id.* at 28.  Hairston sought to cross-examine C.H. about these poems because he wanted the jury to infer, from the tone and content of the poetry, that their sexual relationship was consensual. Therefore, we agree the proposed evidence implicated Rape Shield Law protections, and Hairston's failure to file a pretrial written motion asserting the admissibility of this evidence is fatal to his claim.  *See Commonwealth v. Beltz*, 829 A.2d 680, 684 (Pa. Super. 2003).

Nevertheless, even if we were to find the evidence did not implicate Section 3104, we would still conclude Hairston is entitled to no relief because he failed to demonstrate the relevancy of the evidence.   At the time of Hairston's trial, Pennsylvania Rule of Evidence 401 defined relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Pa.R.E. 401 (1988).[15]

Here, Hairston failed to provide **any evidence** that the poems written by C.H. were, in fact, about him.  The fact that she wrote intimate poetry,

_____

[15] The statute was amended effective March 18, 2013, to read as follows:

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

Pa.R.E. 401.

during the same time period she alleged she was being raped by Hairston, does not demonstrate that she consented to a sexual relationship with him. *See Commonwealth v. Northrip*, 945 A.2d 198, 206 (Pa. Super. 2008) (affirming trial court's preclusion of victim's diary entries that contained no reference to victim's sexual abuse by stepfather; "[b]ecause the evidence contained in these books have had no probative value, we agree with the trial court that the evidence was irrelevant and did not qualify as impeachment evidence."), *aff'd on other grounds*, 985 A.2d 734 (Pa. 2009).

Furthermore, we reject Hairston's contention that the trial court excluded the evidence based on its "own credibility finding regarding [C.H.'s] testimony." Hairston's Brief at 29. Here, C.H. denied the poems were about Hairston, and Hairston presented no evidence to rebut her testimony. The trial court, therefore, properly determined the poems were not relevant to the issues at trial, namely, whether Hairston raped C.H.

Additionally, we note Hairston's reliance on both *Commonwealth v. Baronner*, 471 A.2d 104 (Pa. Super. 1984), and *K.S.F.*, *supra*, is misplaced.

In *Baronner*, the defendant sought to introduce evidence that he and the victim had engaged in consensual sexual relations before the purported rape. At a pretrial hearing, the court refused to permit the evidence because it found the victim credible when she testified that she and the defendant had never engaged in consensual sex. On appeal, a panel of this Court reversed, concluding:

The credibility of appellant's consent defense … was for the jury. It was not for the trial judge to reject relevant trial testimony and keep it from the jury merely because he did not believe it.

**Baronner**, **supra**, 471 A.2d at 106. Here, the trial court did not make a credibility determination regarding Hairston's consent defense. Rather, it determined Hairston's offer of proof regarding the proposed evidence was insufficient. Therefore, we find **Baronner** distinguishable.

The same is true for this Court's decision in **K.S.F.** In that case, the victim alleged that her stepfather had sexually abused her. The defendant sought to introduce evidence of the victim's Facebook profile in which she described herself as a "virgin." Following an *in camera* hearing, in which the victim explained that she meant she never had consensual sex, the court precluded the evidence. On appeal, a panel of this Court reversed, concluding the trial court abused its discretion in determining the victim's explanation of the posting was credible. The panel opined:

"The purpose of [an *in camera*] hearing required by the Rape Shield Law is to enable a trial court to determine whether tendered defense evidence of the victim's prior sexual activity is relevant and admissible." The trial court is not to use the hearing to assess the credibility of the evidence sought to be admitted. Credibility determinations are to be made by the jury.

**K.S.F.**, **supra**, 102 A.3d at 485 (citations omitted). The panel further stated, "nothing was as significant as [the victim's] explicit statement that the very acts that were at the heart of the prosecution in fact may never have occurred." **Id.** at 486. The poems at issue herein do not contain such

an "explicit statement" that the acts at issues may never have occurred.[16]

Therefore, we conclude the trial court properly excluded the evidence on relevance grounds, and, accordingly, Hairston's first claim fails.[17]

Next, Hairston contends the trial court abused its discretion when it permitted Johnson to testify to hearsay statements made by C.H. Our review of a challenge to the admissibility of evidence is well-established:

> The admissibility of evidence is a matter directed to the sound discretion of the trial court, and an appellate court may reverse only upon a showing that the trial court abused that discretion. The threshold inquiry with admission of evidence is whether the evidence is relevant. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." In addition, evidence is only admissible where the probative value of the evidence outweighs its prejudicial impact. However, where the evidence is not relevant there is no need to determine whether the probative value of the evidence outweighs its prejudicial impact.

---

[16] Indeed, upon our review of the poems at issue, we do not find they acknowledge or even intimate that C.H. had engaged in consensual sexual relations with the subject of the prose. **See** Supplemental Statement of Matters Complained of on Appeal, 12/26/2013, Exhibits 1, 2.

[17] We emphasize Hairston was permitted to introduce testimony that C.H. wrote poems of "an intimate nature" during the time she alleged she was being sexually abused by Hairston. N.T., 12/13/2001, 2001, at 158. Further, Hairston also introduced into evidence (1) a Christmas card from 1999, that C.H. sent to Hairston and her mother, which indicated her "good will and thank and love" towards Hairston, and (2) a letter she wrote to them around the time she moved out indicating "the reason why [she was] moving was because of the … verbal fighting between [] Hairston and [her] mother[,]" without any reference to the purposed sexual abuse. N.T., 12/13/2001, at 165-166.

*Stokes*, *supra*, 78 A.3d at 654.

This issue concerns the testimony of C.H.'s boyfriend, Jeffrey Johnson. Johnson, a witness and victim in the case at Docket No. 8984-2000, testified regarding the events that occurred in C.H.'s apartment from the late evening hours of May 20, 2000, to the early morning hours of May 21, 2000. Johnson recounted that when he and C.H. returned to her apartment after a date, C.H. listened to messages on her phone and seemed to get "agitated." N.T., 12/12/2001, at 46. He recounted the phone continued to ring throughout the evening, and C.H. "seemed even more upset" after answering the calls. Thereafter, the following exchange took place:

> [Commonwealth:] Did you ask [C.H.] what was wrong?
>
> [Johnson:] Yes.
>
> I asked her, What's wrong?
>
> I'm like, You are kind of upset.
>
> **[Hairston's Counsel:] Objection, Your Honor, hearsay.**
>
> **…**
>
> **[Commonwealth:] Your Honor, I believe that this witness said the victim, [], was upset and was about to cry.**
>
> **I'm going to ask him just briefly what she was upset about.**
>
> **I think that would be an excited utterance.**
>
> **THE COURT: Objection is overruled.**
>
> BY [COMMONWEALTH:]

[Commonwealth:] Now, when you saw that [C.H.] was upset, you thought she was going to cry, did you ask her what was wrong?

[Johnson:] Yes.

[Commonwealth:] What did she say to you?

[Johnson:] That's when she started crying.

She was like, He won't leave me alone. He's bothering me.

I was like, Who? What's going on?

She was like, My dad. He won't leave me alone. He won't let me lead my life.

I kept asking her to tell me more.

Why are you so upset? What's the problem?

She started getting more in-depth, talking about how he keeps on bothering me. He won't leave me alone.

I kept prying, asking what would make you so upset if he's calling at night.

She was like, Oh, you just don't know. You just don't know.

He did call again and she answered, then she put the phone back down.

She started really crying.

I was like, Tell me what's going. What's wrong? What's going on?

She was like, I don't want to talk about it. I don't want to talk about.

I said, Why don't you tell me what's going on?

Eventually after like a couple seconds she started talking about my father. It happened a long time ago. It started a long time ago.

I was like, What happened a long time ago?

She was like, Well, we had sex.

I was like, What, you know, you guys had sex?

Yeah.  We were having sex when I was young.  He won't leave me along (sic).  He keeps on bothering me.

I was like shocked when she told me her father.

I said, Have you told anybody about this, ever said anything about it?

She said, No.  You are the first person.

She started crying even more.

Then I said, Calm down.

She said, I don't want you to tell nobody.

I said, I'm not going to say nothing.  I am not going to tell anybody anything.

She started telling me about certain incidents, how everything happened.

I was just taken back when she told me.

I asked her, Do you want me to stay the night?  Because she didn't want me to leave.

She's like, No.  Don't stay.

I said, Why?

She said, You don't know my dad.  I got a feeling he's going to come.  He's going to do something.

I said, I'll stay here until you – everything is cool.

**Id.** at 46-49 (emphasis added).  The trial court determined C.H.'s statements were admissible under the excited utterance exception to the hearsay rule.  **See** Trial Court Opinion, 10/23/2014, at 7-8.

It is axiomatic that, as a general rule, hearsay statements are not admissible as evidence.  Pa.R.E. 802.  However, the Pennsylvania Rules of

- 24 -

Evidence provide a number of exceptions to this general rule, including an exception for "excited utterances."  An "excited utterance" is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  Pa.R.E. 803(2).  The Supreme Court has further defined an "excited utterance" as:

> A spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.

*Commonwealth v. Wholaver*, 989 A.2d 883, 906 (Pa. 2010) (citation omitted), *cert. denied,* 549 U.S. 1171 (2007).  While the courts of this Commonwealth have not set a time limit within which the statement must be made after the precipitating startling event, they have explained the "'[t]he crucial question … is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance."  *Id.* at 907 (citation omitted).  Accordingly, "the determination is factually driven, made on a case-by-case basis." *Id.*

This Court's decision in *Commonwealth v. Crosby*, 791 A.2d 366, (Pa. Super. 2002), is instructive.  In that case, the victim, a 30-year-old woman who suffered from cerebral palsy and mental retardation, was transported by van each day to a facility where she performed menial tasks. *Id.* at 368-369.  On the day in question, the victim's mother returned home

with her granddaughter to find the van parked in her driveway. When she walked into the house, the mother "observed her daughter with her shirt pulled up and her abdomen and bra exposed" and the defendant at her side. *Id.* at 369. The mother told the defendant to leave, and retrieved her granddaughter from her car. Several minutes later, the mother confronted the victim, who had retreated to her bedroom. *Id.* When she asked the victim what had happened, the victim "lower[ed] her head, something she typically did when she was upset." *Id.* at 371. She then cried as she told her mother the defendant touched her "'titties' and her 'pee pee' and that it hurt." *Id.* at 369.

On appeal, a panel of this Court considered whether the victim's statement was properly admitted as an excited utterance. The Court noted:

> The excited utterance exception includes statements made in response to questioning as well as those made shortly after the event, not just those made immediately thereafter. What is required, however, is "a sufficient confluence of time and events to vest special reliability in the statement."

*Id.* at 370 (citations omitted). In finding the statement was properly admitted, the panel explained "[t]he emotional state of the victim and the promptness of her statement combine[d] to satisfy the rule." *Id.* at 371.

In the present case, Hairston contends the trial court abused its discretion when it admitted C.H.'s statements to Johnson as an excited utterance. Specifically, Hairston argues the statements were not uttered, spontaneously, in response to a startling event, but rather, "it was only with Johnson's cajoling that [C.H.] described, over a two hour period, the

- 26 -

allegations against her step-father." Hairston's Brief at 34. He asserts there was no startling event that preceded her statements, and the court's ruling would allow the admission of statements made "by anyone who appeared to be upset about something[]" which, he emphasizes, "is not, and has never been the rule." *Id.* at 35. Furthermore, Hairston contends the court's ruling was prejudicial because Johnson's narrative "unfairly bolstered" the victim's credibility, by permitting Johnson "to give the jury [C.H.'s] version of [the] events before [she] even testified." *Id.*

Relying on ***Crosby***, ***supra***, the trial court concluded C.H.'s statements to Johnson were admissible as an "excited utterance." Specifically, the court opined:

> [T]he evidence established that [C.H.] was "upset". When she began to tell what had happened, she, too began to cry. Just as the victim being "upset" and crying in ***Crosby*** was sufficient to establish that the victim was "suddenly made subject to an overpowering emotion", so, too, those facts were sufficient in this matter to establish that this victim was made subject to that emotional state when she made her statements. In addition, the statements made by [C.H.] were made a short time period after the events she was describing had taken place. Finally, the fact that her statements came as a result of questioning from Mr. Johnson did not render them inadmissible hearsay. The victim's mother in ***Crosby*** also asked questions to elicit the statements. The Court is satisfied that [C.H.'s] statements to Johnson were properly admitted as excited utterances.

Trial Court Opinion 10/23/2014, at 8.

We disagree. Although we conclude [C.H.'s] statements that Hairston was bothering her and would not leave her alone might qualify as excited utterances, her later prolonged confession of the ongoing sexual abuse does

not.  The facts in the present case are much different from those in ***Crosby***.

In that case, the victim's statements were made minutes after the abusive

act.   Based on the victim's limited mental capacity and highly emotional

state, it was very unlikely that her statements "emanated in whole or in part

from [her] reflective faculties."  ***Crosby***, ***supra***, 791 A.2d at 370 (citation

omitted).

Conversely, in the present case, C.H.'s statements did not immediately

follow the sexually abusive acts.  Further, while Hairston's phone calls may

have been upsetting, C.H. did not allege that Hairston said anything that

could be construed as "shocking," so as to make her subject to an

"overpowering emotion."  ***Id.*** (citation omitted).  Moreover, according to

Johnson, she was very reluctant to tell him what was bothering her.  He had

to ask her again and again, before she finally relented.   This repeated

cajoling is much more extensive than the circumstances in ***Crosby***, where

the victim's mother "asked her daughter what had happened," and victim

immediately told her mother about the abuse.  ***Id.*** at 369.  Accordingly, we

conclude C.H.'s statements concerning the sexual abuse did not qualify as

an excited utterance because (1) they were not made shortly after the

abuse, and (2) they were made only after prolonged questioning by Johnson

when C.H. had time to formulate her response.  Therefore, we find the trial

court erred in admitting the statements under the excited utterance

exception to the hearsay rule.

Nevertheless, we may affirm the decision of the trial court "on any applicable basis." *Commonwealth v. Lambert*, 57 A.3d 645, 648 n.1 (Pa. Super. 2012), *appeal denied*, 67 A.3d 795 (Pa. 2013). Here, we conclude Hairston waived his challenge to the admissibility of the statements in question.

It is axiomatic that "[i]n order to preserve an issue for review, a party must make a timely and specific objection." *Commonwealth v. Duffy*, 832 A.2d 1132, 1136 (Pa. Super. 2003) (quotation omitted), *appeal denied*, 845 A.2d 816 (Pa. 2004). *See also* Pa.R.E. 103(a)(1) ("A party may claim error in a ruling to admit … evidence only: (1) if … a party, on the record: (A) makes a timely objection, motion to strike, or motion *in limine*; and (B) states the specific ground, unless it was apparent from the context[.]"). Moreover, the Pennsylvania Rules of Evidence further provide that "[o]nce the court rules definitively on the record--either before or at trial--a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Pa.R.E. 103(b).

Here, after Johnson testified C.H. was visibly upset as a result of the phone calls she was receiving, he stated he asked her what was wrong. At that point, Hairston objected, claiming the testimony would be hearsay. N.T., 12/12/2001, at 46-47. The prosecutor responded, "I'm going to ask him just briefly what she was upset about. I think that would be an excited utterance." *Id.* at 47. The court overruled Hairston's objection. The prosecutor then asked Johnson if he asked C.H. what was wrong, to which

he replied, "Yes." *Id.* The prosecutor next asked, "What did she say to you?" *Id.* Johnson responded that C.H. began crying and told him her father keeps bothering her, and will not leave her alone. *Id.* As stated above, we agree with the trial court that those statements by C.H. were admissible as an excited utterance. C.H. was visibly upset as a result of the repeated phone calls, and the statements were made in reference to the calls and immediately thereafter. *See Crosby*, *supra*, 791 A.2d at 370.

However, Johnson then testified that he "kept asking her to tell [him] more" and he "kept prying, asking what would make [her] so upset if he's calling at night." N.T., 12/12/2001, at 47-48. He also stated C.H. was reluctant to tell him why she was upset, and kept saying "I don't want to talk about it." *Id.* at 48. It was not until Johnson asked her multiple times what was wrong, that C.H. finally responded, "[i]t happened a long time ago" and admitted she and Hairston "had sex." *Id.*

We find Hairston should have objected when Johnson began to testify what C.H. told him after his persistent coaxing. Although her initial comment, that Hairston would not leave her alone, qualified as an excited utterance, C.H.'s further statements regarding the reasons for their dispute did not. Hairston's failure to object at that critical juncture waives his claim on appeal. *Duffy*, *supra*.

Further, we do not find Hairston's first objection preserved his claim of error. *See* Pa.R.E. 103(b). As noted above, when Hairston first objected, the trial court properly overruled the objection, permitting the prosecutor to

"ask [Johnson] briefly what [C.H.] was upset about." N.T., 12/12/2001, at 47. Once Johnson relayed C.H.'s statement that her stepfather would not leave her alone, the excited utterance was complete. Any further statements by her describing her relationship with Hairston were inadmissible hearsay. Therefore, Hairston should have objected to Johnson's persistent testimony, and no relief is warranted on this claim.[18]

---

[18] Moreover, we conclude that even if Hairston had properly objected to the testimony, any error on the part of the trial court in admitting C.H.'s hearsay statements was harmless.

> [O]nce it is determined that the trial court erred in admitting the evidence, the inquiry becomes whether the appellate court is convinced beyond a reasonable doubt that such error was harmless. *Id.* Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Stokes*, *supra*, 78 A.3d at 654.

Here, the Commonwealth asserts Johnson's testimony was merely cumulative of C.H.'s testimony. Commonwealth's Brief at 52. We agree. Moreover, Hairston, through counsel, conceded that he and C.H. had been having sex since she was 18 years old, although he asserted their relationship was consensual. Therefore, C.H.'s statements that (1) "[i]t started a long time ago," (2) "we had sex," and (3) "[w]e were having sex when I was young," did not necessarily contradict Hairston's contention that he had been having consensual sex with his stepdaughter for three years. N.T., 12/12/2001, at 48. Accordingly, we would conclude that any error in admitting these hearsay statement was harmless beyond a reasonable doubt. *Stokes*, *supra*.

In his last evidentiary challenge, Hairston argues the trial court abused its discretion in permitting testimony that C.H.'s mother and brother were deceased. As noted above, we review a challenge to the admissibility of evidence for an abuse of discretion. *Stokes*, *supra*.

Following Hairston's cross-examination of C.H., the Commonwealth requested permission to "delve into what happened to the victim's mother and brother" during its redirect examination. N.T., 12/13/2001, at 183. The Commonwealth argued Hairston's cross-examination suggested that either C.H.'s mother or brother should have noticed something was wrong. The prosecutor explained:

> On two different occasions [defense counsel] asked whether or not the mother was home when the [C.H.] came home. [C.H.] was crying uncontrollably on her way home, whether or not her mother said anything to her about that.
>
> The suggestion of [this] testimony in court was clearly that if this really happened to her that there would be someone at home who would see it and notice something wrong.
>
> The second matter is that [defense counsel] asked her specifically about an incident which happened in her bedroom and it happened at night and her brother was there and was in the other bed.

*Id.* at 183. Therefore, the Commonwealth asked the court to permit testimony that C.H.'s mother and brother were not available to testify because they were deceased, and that Hairston killed them. *Id.* at 184. Defense counsel objected, arguing (1) he did not "open[]the door" for such testimony, and (2) testimony regarding the homicide charges, for which Hairston had not been convicted, would be improper. *Id.* at 184-185. After

consideration of the parties' arguments, the court permitted the Commonwealth to present evidence that C.H.'s mother and brother were unavailable as witnesses because they were deceased, but precluded any reference as to how they died. *Id.* at 185.

Thereafter, during C.H.'s testimony on redirect, the following exchange took place:

[Commonwealth:]    What  is  [your  grandmother's]  physical condition?[19]

[C.H.:]  She really – she can't do very much.

[Commonwealth]:  Why is that?

[C.H.:]  She's had two strokes and two heart attacks.

[Commonwealth:]  And where are your mother and your brother at this time?

[C.H.:] They are both deceased.

[Commonwealth:]  Thank you.

That's all.

*Id.* at 192-193.

Hairston argues, first, the testimony was not relevant because he never suggested that C.H.'s "mother, brother or anyone else witnessed any relevant events and could testify to them."  Hairston's Brief at 37.  Further, he claims that because C.H. testified her mother and brother "knew nothing

_____

[19] C.H.'s grandmother also lived at her parents' house at the time of the alleged sexual abuse.

about these events … their absence as witnesses [was] perfectly understandable." *Id.* at 38. Moreover, he contends that even if the testimony was in some way relevant, its prejudicial impact clearly outweighed any probative value. *Id.* at 38-39. Accordingly, Hairston asserts the trial court abused its discretion in allowing this testimony.

The trial court, in its opinion, addressed this claim as follows:

The Commonwealth was not permitted to put before the jury that [C.H.'s] mother and brother were dead until after [Hairston], through his cross-examination of [her], established that during some of the events to which [she] testified her mother and brother were present. The failure of [her] mother and brother to testify could have allowed the jury to infer that they did not testify because they would not have supported [C.H.'s] claims. Defense counsel's cross[-]examination made much of the fact that the assaults took place in [C.H.'s] home; a home where the jury would likely conclude she lived with [Hairston], her step-father, her mother and her brother. In response to one objection during this cross-examination, defense counsel stated that he was trying to establish, "If she had the availability to tell anybody who was close to her." Counsel examined [C.H.] on letters she wrote to [Hairston] and her mother. Those letters were admitted into evidence. He also asked if her mother and grandmother were present in the home after one of the incidents with [Hairston]. The prosecutor specifically mentioned this when she asked the Court to permit her to introduce evidence of their deaths: "On two different occasions he asked whether or not the mother was home when the victim came home." The prosecutor pointed out that [C.H.] testified that she was crying uncontrollably. [Hairston] suggested that "…if this really happened to her that there would [be] someone at home who would see it and notice something wrong." Finally, defense counsel asked [C.H.] about one of the incidents that happened in a room where her brother was sleeping in the other bed. Through this examination, defense counsel inferred that if [her] story were true, others in the home, especially her mother, would have been aware.

- 34 -

The Commonwealth sought to present to the jury evidence establishing not only that they were dead; but also that the defendant was charged with murdering them. This was not permitted. The only reference to [C.H.'s] mother occurred when [C.H.] was asked, "And where are your mother and brother at this time?" She responded, "They are both deceased." This was the only reference to their deaths. The jury did not know when they died, how they died or whether the defendant had anything to do with their deaths. They could just as easily have been killed in a car accident as far as the[] jury knew from this testimony. The fact that they were dead became relevant when [Hairston], through his cross-examination, established that the mother and brother may have been witnesses to these events. The Commonwealth was simply permitted to offer to the jury an explanation for their absence; an explanation that in no way prejudiced [Hairston].

Trial Court Opinion, 10/23/2014, at 13-14 (record citations omitted).

We agree with the well-reasoned decision of the trial court. Our review of the testimony reveals Hairston suggested numerous times during his cross-examination that C.H. was lying because someone at the home would have noticed her change in demeanor immediately after the assaults. *See also* N.T., 12/12/2001 at 105-106, 113, 121-122. Moreover, Hairston emphasized that during some of the alleged assaults, C.H.'s brother was sleeping in the bed next to her. *See id.* at 117-118. Accordingly, we agree that testimony explaining the absence of her mother and brother from trial was relevant and admissible. Further, we also find Hairston has failed to demonstrate how he was unduly prejudiced by this brief testimony. Therefore, this claim fails.

Hairston's next issue focuses on the court's jury instructions. Our review of a challenge to the court's charge is well-established:

> In reviewing a jury charge, we are to determine "whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case." ***Commonwealth v. Brown***, 911 A.2d 576, 582–83 (Pa. Super.2006). In so doing, we must view the charge as a whole, recognizing that the trial court is free to use its own form of expression in creating the charge. ***Commonwealth v. Hamilton***, 766 A.2d 874, 878 (Pa.Super.2001). "[Our] key inquiry is whether the instruction on a particular issue adequately, accurately and clearly presents the law to the jury, and is sufficient to guide the jury in its deliberations." ***Id.*** It is well-settled that "the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal." ***Brown***, 911 A.2d at 583.

***Commonwealth v. Scott***, 73 A.3d 599, 602 (Pa. Super. 2013) (emphasis added).

Hairston contends the trial court erred in refusing to instruct the jury on the "mistake of fact" defense. "It is well established that a bona fide, reasonable mistake of fact may, under certain circumstances, negate the element of criminal intent." ***Commonwealth v. Namack***, 663 A.2d 191, 194 (Pa. Super. 1995). This legal maxim is codified at Section 304 of the Crimes Code, which provides, in relevant part, "[i]gnorance or mistake as to a matter of fact, for which there is reasonable explanation or excuse, is a defense if … the ignorance or mistake negatives the intent, knowledge, belief, recklessness, or negligence required to establish a material element of the offense[.]" 18 Pa.C.S. § 304(1). ***See*** Pa. SSJI (Crim) 8.304.

Here, Hairston argues he was entitled to a "mistake of fact" instruction to support his defense of consent. He asserts, "based on [C.H.'s] conduct in

the three years preceding Hairston's arrest, he was misled into believing that she was consenting to the various sexual acts in which they engaged." Hairston's Brief at 39-40. Specifically, Hairston claims he "reasonably mistook" the following conduct as indicating her consent: C.H. (1) never told anyone of the sexual acts, and no one close to her "was even aware of any distress these incidents were causing her[;]" (2) never acted unusual around her family; (3) spent "much of this period" living away from Hairston; (4) admitted "he was never physically violent towards her[;]" and (5) gave him a Christmas card and letter that contained "no indication" of a trauma in their relationship. *Id.* at 48.

At trial, the court refused to provide a "mistake of fact" instruction in the absence of any evidence concerning Hairston's state of mind. The court commented that Hairston could not avail himself "of the concept of mistake of fact unless he gets up and says I didn't understand it." N.T., 12/13/2001, at 241. In its opinion, the court elaborated on its ruling as follows:

> First, the Court would note that Pennsylvania law does not recognize mistake of fact as to consent as a defense to rape and involuntarily (sic) deviate sexual intercourse. ***Commonwealth v. Williams***, 439 A.2d 765, 769 (Pa. Super. 1982). The Superior Court reached the same conclusion sixteen (16) years later in ***Commonwealth v.*** [***Fischer***], 721 A.2d 1111 (Pa. Super. 1998). Though the [Supreme] Court initially granted allocatur in ***Commonwealth v.*** [***Fischer***], 730 A.2d 485 (Pa. 1999), it later dismissed that appeal as having been improvidently granted. 745 A.2d 1214 (Pa. 2000). Though the Superior Court in [***Fischer***] expressed some reservations about the continued applicability in ***Willliams***, it felt that it was bound by its holding and affirmed a lower court's decision that mistake

of fact as to consent is not an available defense in the prosecution of sexual offenses.

In addition, even if such an instruction were permitted, the evidence presented did not warrant giving the jury this instruction. Defendants are entitled to [a] requested instruction when the instruction is supported by the evidence. **Commonwealth v. Markman**, 916 A.2d 586, 697 (Pa. 2007). When, however, the record does not contain evidence sufficient to require that a jury decide the issue addressed by the instruction, the instruction should not be given. **Commonwealth v. Washington**, 692 A.2d 1024, 1028-29 (Pa. 1997). The record in this matter contains no evidence tending to establish that the defendant mistakenly believed that the victim consented. The defendants' (sic) claim that the Court's determination that there was not sufficient evidence warranting such an instruction somehow shifted to him the burden of proof is devoid of merit. The Court, in stating that the record contained no such evidence, was not suggesting that the defendant had the burden to produce such evidence through his own testimony or through some other means. It was simply stating that the record did not contain that evidence. The Court stated, when denying the requested instruction, "He can't avail himself of mistake of fact as to his state of mind, as I see it, without some affirmative evidence, either she saying he didn't or someone saying he didn't know what he was doing or he saying he didn't know what he was doing." (N.T.[, 12/13/2001,] 241-242). Clearly, the Court was not suggesting that the defendant had any burden to produce evidence or to prove anything. It was simply observing that there was nothing in the record warranting the instruction. Accordingly, his claim that the Court erred in not providing this instruction is without merit.

Trial Court Opinion, 10/23/2014, at 11-12.

In response to the court's ruling, Hairston acknowledges the decision in **Commonwealth v. Williams**, 439 A.2d 765 (Pa. Super. 1982), precludes a "mistake of fact" defense in a rape case. However, he asserts that this Court should either (1) overrule **Williams** on the basis that it was wrongly decided, and follow, instead the decision in **Commonwealth v.**

*Carter*, 418 A.2d 537 (Pa. Super. 1980), or (2) determine the trial court erred in failing to provide a "mistake of fact" instruction with regard to the "multiple counts in [Hairston's] Informations that are outside the **Williams** rule[.]" Hairston's Brief at 41. For the reasons that follow, we decline to adopt either position advanced by Hairston.

A discussion of **Williams**, *supra*, and its progeny is essential to our ruling. In **Williams**, *supra*, the victim accepted a ride from the defendant, a stranger, who locked the doors, threatened to kill her if she attempted to leave, and told her "all he wanted was 'a little sex.'" **Id.** at 767. The defendant then drove the victim to a dark area outside of the city, where the victim told him "to go ahead, because she did not want him to hurt her." **Id.** (internal quotations omitted). They then engaged in several sexual acts, including intercourse. After the encounter, the defendant dropped the victim off back in the city. The victim recorded the license plate of the defendant's vehicle and immediately reported the incident to the police. On appeal, the defendant argued, *inter alia*, that the trial court "should have instructed the jury that if the defendant reasonably believed that the prosecutrix had consented to his sexual advances that this would constitute a defense to the rape and involuntary deviate sexual intercourse charge." **Williams**, *supra*, 439 A.2d at 769. A panel of this Court disagreed:

> In so refusing the proffered charge the court acted correctly. The charge requested by the defendant is not now and has never been the law of Pennsylvania. The crux of the offense of rape is force and lack of victim's consent. **Commonwealth v. Walker**, 468 Pa. 323, 362 A.2d 227 (1976). When one individual uses

force or the threat thereof to have sexual relations with a person not his spouse and without the person's consent he has committed the crime of rape. 18 Pa.C.S.A. 3121. If the element of the defendant's belief as to the victim's state of mind is to be established as a defense to the crime of rape then it should be done by our legislature which has the power to define crimes and offenses. We refuse to create such a defense.

*Id.*

In *Commonwealth v. Fischer*, 721 A.2d 1111 (Pa. Super. 1988), *appeal dismissed as improvidently granted*, 745 A.2d 1214 (Pa. 2000), this Court reaffirmed the holding in *Williams*, albeit with reservations. Fischer involved an alleged date rape between college classmates. Both the victim and defendant agreed that they engaged in "intimate contact" a few hours before the incident, although they disagreed as to what actually occurred. *Fischer*, *supra*, 721 A.2d at 1112. The victim testified the contact was "limited to kissing and fondling," while the defendant testified they engaged in oral sex with the victim acting aggressively and biting his chest. *Id.* They separated after the encounter only to meet up again later that evening. According to the victim, during the second encounter the defendant sexually assaulted her against her will, locking her in his room and holding her wrists above her head. *Id.* The defendant claimed, however, that the victim was, at first, a willing participant, but once she told him to stop, he did. *Id.* at 1113. His defense, which was ultimately rejected by the jury, was that, based upon the victim's aggressive behavior in their initial encounter, and her conduct throughout the second encounter, he "did not believe his actions were taken without [the victim's] consent." *Id.*

On appeal, the defendant asserted trial counsel was ineffective for failing to request a "mistake of fact" jury instruction. Although he recognized the precedential effect of **Williams**, the defendant argued (1) the "stranger rape" facts in **Williams** were distinguishable from the facts in his case, and (2) the law regarding "date rape" had changed significantly over the past decade such that a mistake of fact charge was necessary. **Id.** at 1114. While acknowledging the changing tide in sexual assault cases, the **Fischer** panel ultimately rejected the defendant's argument finding that **Williams** controlled. The Court opined: "It is clear … that the **Williams** court's basis for denying the jury instruction was its conclusion that the law did not require it and, further, that the judiciary had no authority to grant it. Even if we were to disagree with those conclusions, we are powerless to alter them." **Id.** at 1118. **See also Commonwealth v. Farmer**, 758 A.2d 173, 178 (Pa. Super. 2000) (rejecting defendant's argument that the **Fischer** Court "sent a clear signal that Pennsylvania law was ready to require a charge as to defendant's mental state when at issue[;]" "We are not convinced that the law in Pennsylvania actually was changing, as **Fischer** expressly held that such an instruction would be 'a significant departure from the current state of the law.'") (citation omitted), *appeal denied*, 771 A.2d 1279 (Pa. 2001).

Accordingly, pursuant to the above precedent, a "mistake of fact" jury instruction is not appropriate in sexual assault cases. While Hairston insists the **Williams** decision was wrongly decided, we remind him that, even if we

did agree (which we do not), "[t]his panel is not empowered to overrule another panel of the Superior Court." *Commonwealth v. Beck*, 78 A.3d 656, 659 (Pa. Super. 2013) (citation omitted).

Nonetheless, Hairston also contends that we need not overrule the decision in *Williams* to provide him with relief. Rather, he asserts, we may simply follow the conflicting holdings of this Court in *Commonwealth v. Carter*, *supra*, and *Commonwealth v. Thomson*, 673 A.2d 357 (Pa. Super. 1996), *appeal denied*, 686 A.2d 1310 (Pa. 1996). Again, we disagree.

In *Carter*, *supra*, the defendant, an employee at an institution for the mentally retarded, engaged in sexual intercourse with a patient at the facility. He was subsequently convicted of rape under 18 Pa.C.S. § 3121(a)(4), which, at that time, criminalized sex with a person "who is so mentally deranged or deficient that such person is incapable of consent." *Id.* at 542. In reversing the conviction and remanding for a new trial, this Court held that the Commonwealth was required to prove the defendant **knew** the victim was incapable of consent or was **reckless** with respect to the element of consent. *Id.* at 543. Similarly, in *Thomson*, *supra*, the defendant was convicted of violating Section 3121(a)(4), after engaging in sexual relations with his children's mentally retarded babysitter. *Thomson*, *supra*, 673 A.2d at 358. On appeal, this Court rejected the defendant's challenge to the sufficiency of the evidence, concluding there was sufficient evidence for the trial court to conclude that the defendant had **actual**

**knowledge** of the victim's mental deficiencies, or was **reckless** with regard to that fact. *Id.* at 360.

We find the decisions in *Carter* and *Thomson* distinguishable since, pursuant to the statutory subsections at issue in those cases, the victim's consent, or lack thereof, was an element of the crime. Here, the victim's lack of consent, or inability to consent, is not an element of the subsections of the crimes of rape and IDSI for which Hairston was convicted. Therefore, *Williams* controls.

Hairston also argues, however, he was "charged with multiple counts in these Informations that are outside the *Williams* rule and are charges for which a mistake of fact instruction was perfectly proper." Hairston's Brief at 41. Although we acknowledge the victim's lack of consent was an element of the charges of sexual assault, aggravated indecent assault, and indecent assault,[20] we agree with the ruling of the trial court that there was insufficient evidence Hairston mistakenly believed the victim had consented to the sexual relationship to support a "mistake of fact" jury charge. *See* Trial Court Opinion, 10/23/2014, at 11-12. Accordingly, no relief is warranted on this claim.

_____

[20] *See* N.T., 12/13/2001, at 301-304 (jury charge).

In his penultimate claim, Hairston contends the accumulation of prejudice from the above asserted trial court errors warrants a new trial. We disagree.

As Hairston concedes, it is well-established that "an appellant cannot bootstrap a series of meritless claims into a cumulative claim of error." *Commonwealth v. Kearney*, 92 A.3d 51, 62 (Pa. Super. 2014), *appeal denied*, 101 A.3d 102 (Pa. 2014). Nevertheless, he insists that "multiple claims of error that are legally meritorious may be accumulated to determine if the net prejudice such errors produced warrant the grant of a new trial or other relief." Hairston's Brief at 49. Setting aside, for the moment, the fact that the cases cited by Hairston all concern the potential accumulation of prejudice based upon **multiple instances of counsel's ineffectiveness** in a PCRA appeal,[21] here, we have concluded that **none** of the allegations of error raised by Hairston are legally meritorious. Therefore, he is entitled to no relief based on the accumulation of prejudice.

Lastly, Hairston argues the trial court imposed an illegal sentence in light of the United States Supreme Court's decision in *Alleyne v. United States*, 133 S.Ct. 2151 (U.S. 2013). We agree.

_____

[21] *See Commonwealth v. Reid*, 99 A.3d 427, 467 (Pa. 2014); *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1150 (Pa. 2012); *Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009).

In **Alleyne**, the United States Supreme Court held "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." **Alleyne**, 133 S.Ct. at 2155 (emphasis added). Applying that mandate, this Court has held that **Alleyne** renders most of our mandatory minimum sentencing statutes unconstitutional. **See Commonwealth v. Newman**, 99 A.3d 86 (Pa. Super. 2014) (*en banc*), **supra** (finding 42 Pa.C.S. § 9712.1 unconstitutional). **See also Commonwealth v. Vargas**, 108 A.3d 858 (Pa. Super. 2014) (*en banc*) (applying **Newman** to 18 Pa.C.S. § 7508); **Commonwealth v. Bizzel**, 107 A.3d 102 (Pa. Super. 2014) (applying **Newman** to 18 Pa.C.S. § 6317); **Commonwealth v. Wolfe**, 106 A.3d 800, 805 (2014) (applying **Newman** to 42 Pa.C.S. § 9718), *appeal granted*, ____ A.3d ____, 2015 WL 4755651 (Pa. Aug. 12, 2015); **Commonwealth v. Valentine**, 101 A.3d 801 (Pa. Super 2014) (applying **Newman** to 42 Pa.C.S. §§ 9712 and 9713).[22] Furthermore, this Court has found that "a

_____

[22] Recently, our Supreme Court addressed the impact of **Alleyne** on the mandatory minimum sentencing provision found in 18 Pa.C.S. § 6317, which provides for a mandatory two years' incarceration when a defendant is convicted of selling drugs within 1,000 feet of a school. The Court's decision signaled its agreement with the *en banc* panel in **Newman**. The Court held:

> [W]e are constrained to conclude that the United States Supreme Court's decision in **Alleyne** renders Section 6317 unconstitutional and, further, that, in light of clear legislative intent, severance of the violative provisions from the statute is not permissible.

*(Footnote Continued Next Page)*

challenge to a sentence premised upon **Alleyne** … implicates the legality of the sentence and cannot be waived on appeal." **Newman**, **supra**, 99 A.3d at 90.

In the present case, on December 17, 2001, the Commonwealth filed two notices, one at each docket number, of its intent to seek a mandatory minimum sentence. At Docket No. 8984-2000, the Commonwealth sought a mandatory minimum sentence pursuant to 42 Pa.C.S. § 9712 for the charge of attempted rape because Hairston committed the crime while visibly possessing a firearm. **See** 42 Pa.C.S. § 9712(a) (mandatory minimum five years' incarceration "if the person visibly possessed a firearm … that placed the victim in reasonable fear of death or serious bodily injury, during the commission of the offense[.]"). At Docket No. 9862-2000, the Commonwealth sought a mandatory minimum sentence pursuant to 42 Pa.C.S. § 9718 for the charge of IDSI because the victim was under the age of 16 years old. **See** 42 Pa.C.S. § 9718(a) (mandatory minimum 10 years' incarceration for conviction of IDSI "when the victim is less than 16 years of age[.]"). The trial court's sentencing orders at each docket number indicate the mandatory minimum sentences were imposed. **See** Order 2/28/2002,

*(Footnote Continued)* ───────────────

**Commonwealth v. Hopkins**, 117 A.3d 247, 249 (Pa. 2015).

Docket No. 8984-2000, Count 2 (attempted rape);[23] Order 2/28/2002,

Docket No. 9862-2000, Count 5 and 6 (IDSI and indecent assault).[24]

Therefore, we are constrained by **Newman**, **Valentine**, and **Wolfe** to

reverse the judgment of sentence, and remand for resentencing without

consideration of the Section 9712 and Section 9718 mandatory minimums.[25]

_____

[23] Although the trial court imposed a mandatory minimum sentence of 10 to 20 years' imprisonment for the charge of attempted rape, Section 9712(a) provides for a mandatory minimum sentence of only five years' imprisonment for the commission of a crime while visibly possessing a firearm.   Nonetheless, Section 9712(c) provides that "[n]othing in this section shall prevent the sentencing court from imposing a sentence greater than that provided in this section."   42 Pa.C.S. § 9712(c).

[24] We note that while the sentencing order at Docket No. 9862-2000, indicates the mandatory minimum was applied to Counts 5 and 6, only one term of ten to twenty years' imprisonment was imposed.   It is unclear if the trial court intended the sentence for indecent assault to merge the sentence for IDSI.   Further, our attempts to secure a copy of the sentencing transcript for clarification have proved futile.   Nevertheless, because we must vacate the entire sentence, the trial court will have the opportunity to clarify its sentencing scheme on remand.

[25] The Commonwealth argues this Court could find the sentence imposed for attempted rape at Docket No. 8984-2000 is not violative of **Alleyne** because the factual predicate for applying the mandatory minimum, that is, visible possession of a firearm, was determined by the jury as evident in their guilty verdict on the charge of firearms not to be carried without a license.  **See** Commonwealth's Brief at 24-25.   However, that argument was rejected by this Court in **Wolfe**, **supra**.  **See id.** (rejecting claim that imposition of mandatory minimum sentence pursuant to Section 9718 was proper since the "jury was required to find that the victim was less than 16 years of age in order to convict" the defendant of 18 Pa.C.S. § 3123(a)(7); "**Newman** stands for the proposition that mandatory minimum sentence statutes in Pennsylvania of this format are void in their entirety.").

Judgment of sentence vacated. Case remanded for resentencing consistent with this Memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/17/2015